

FILED
May 02 2025, 8:55 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Judy Lammons,

*Appellant-Defendant/Counter-Plaintiff*

v.

EDCO Environmental Services, Inc.,

*Appellee-Plaintiff/Counter-Defendant*

---

May 2, 2025

Court of Appeals Case No.
24A-CT-2057

Appeal from the Lake Superior Court

The Honorable Bruce D. Parent, Judge

Trial Court Cause No.
45D11-2002-CT-225

---

**Opinion by Judge Tavitas**
Chief Judge Altice and Judge Brown concur.

**Tavitas, Judge.**

## Case Summary

[1] In 2014, EDCO Environmental Services, Inc. ("EDCO") installed a boiler in Judy Lammons' home in Crown Point ("the City"). Lammons experienced issues with the boiler and eventually learned that the boiler had been manufactured in 2003. The City refused to inspect the boiler because a permit had not been acquired, even though a permit was not required by city ordinance. Lammons appeared before the Crown Point City Council regarding the need for such an ordinance, discussed her dealings with EDCO, and asked the City to protect consumers from "unscrupulous licensed contractors[.]" Ex. Vol. IV p. 40. EDCO sued Lammons, alleging that her statements constituted defamation, and after a bench trial, the trial court ruled in EDCO's favor.

[2] Lammons appeals and argues that her statements, as a matter of law, do not constitute false defamatory statements. Because Lammons' statements neither state nor imply a provably false fact but merely indicate her honestly held opinion, we conclude that the trial court's findings are clearly erroneous. Accordingly, we reverse the judgment of the trial court.

## Issue

[3] Lammons raises several issues; however, we find one issue dispositive, which we rephrase as whether Lammons' statements to the City Council, including her use of "unscrupulous," constitute false and defamatory statements as a matter of law.

## Facts

On February 16, 2014, Lammons called EDCO, an HVAC company she had used in the past, to her home in Crown Point ("the City") because her boiler was leaking and not providing heat. A technician from EDCO serviced the boiler and got it functioning; however, this was apparently only a temporary fix. EDCO called Lammons the next day and offered to either "get parts" for the current boiler or install a "new" high-efficiency boiler. Tr. Vol. III p. 33. Lammons chose the latter option, believing that the "new" boiler would have been manufactured that same year—in 2014. EDCO installed the boiler later that day. The invoice for the service states, "Work Performed: Installed new hot boiler[.]" Ex. Vol. IV p. 30. EDCO did not discuss with Lammons any need for a permit when installing the boiler.

Lammons contacted EDCO for another service call in March 2014. The new boiler was leaking, so EDCO installed a "condensate pump[.]" Tr. Vol. III p. 36; Ex. Vol. IV p. 31. In 2016, Lammons again contacted EDCO for additional service for her boiler.[1]

Lammons continued to experience problems with the boiler in November 2017. This time, she contacted a different HVAC company, MN Heating and Air Conditioning ("MN"). MN's owner, Marcel Noordermeer, responded to the service call on November 3, 2017, and discovered that the boiler was not

---

[1] The invoice for this service call, including the exact date, is difficult to decipher.

providing heat because it was in a "hard lockout," which meant the boiler could not be "reset." Tr. Vol. II p. 228. Additionally, the "condensate pump was not hooked up correctly." Ex. Vol. V p. 15. Noordermeer looked up the serial number for the boiler and learned that it had been manufactured in 2003, eleven years before its installation.

[7] Noordermeer contacted the manufacturer, who recommended "replacing the harness" to resolve the lockout. Tr. Vol. II p. 229. Noordermeer, however, was unable to procure the harness from a wholesaler because the part had been "update[d]." *Id.* Though he was unable to replace the harness, Noordermeer was able to restore functionality to the boiler.

[8] Lammons was upset that EDCO had not informed her that the boiler was manufactured in 2003. On November 7, 2017, she filed a consumer complaint with the Indiana Attorney General's Office against EDCO, stating: "This 'new' boiler that I have had for 3 years is already around 14 years old!" Ex. Vol. IV p. 14. Due to the boiler's age, Lammons was concerned about having been overcharged for the boiler and the ability to find replacement parts.

[9] The Attorney General's Office contacted EDCO regarding Lammons' complaint, and EDCO's president, Eric Dorris, responded. Dorris stated that, at the time of installation, the boiler "was the most compatible size and fastest option" for Lammons; the boiler had never been used before the installation; and the model was "still offered" by the manufacturer and was "fully supported with repair parts." *Id.* at 15-16. To resolve the matter, EDCO offered

Lammons a ten-year parts and labor warranty provided that EDCO "must be the licensed contractor rendering the services" because EDCO would be absorbing the cost of the warranty. *Id*. at 16. Lammons declined the offer because she "didn't trust [EDCO] at that point in time." Tr. Vol. III p. 41. There were no further developments regarding Lammons' consumer complaint.

[10] On May 23, 2018, Lammons filed a small claims action against EDCO. She alleged that EDCO advertised the boiler to her as "new," although the boiler was manufactured in 2003. Ex. Vol. IV p. 26. The small claims court issued a summary ruling in favor of EDCO.[2]

[11] On August 31, 2018, Lammons again contacted MN to restore functionality to the boiler. Noordermeer serviced the boiler and discovered "abnormal wear that shouldn't be on a boiler of that age." Tr. Vol. II p. 231. Noordermeer also discovered code violations regarding the installation of the boiler: the exhaust pipes did not have sufficient separation; fittings between pipes were improper; the unit had insufficient "shut off[s]"; and the unit lacked a two-inch foundation as required by the manufacturer. Ex. Vol. V p. 15; Tr. Vol. II pp. 244-45. According to Noordermeer, the degree of "wear and tear" would have been more "normal" had the boiler been installed correctly. Tr. Vol. II p. 245.

---

[2] The basis for the small claims court's ruling is unclear from the record. Lammons claimed, at trial in this matter, that the small claims court ruled against her because she was unable to produce the invoice for the boiler installation, despite requesting that EDCO produce it for her.

[12] On October 8, 2018, Lammons went to EDCO's office. According to Dorris, Lammons threatened to help the City of Crown Point in ongoing litigation between the City and EDCO if EDCO did not pay for another contractor to replace her boiler.

[13] Later that year, Lammons filed a claim regarding the code violations with the insurance company holding EDCO's surety bond with the City.[3] A representative of the insurance company informed Lammons that it could take no action unless the City inspected the boiler. The City Building Inspector, however, informed Lammons that the City "require[s] a permit when upgrading to a high efficiency furnace,"[4] which neither Lammons nor EDCO had sought, and that the Building Inspector "cannot do an inspection at any property unless a permit is obtained." Ex. Vol. V p. 19. The insurance company denied Lammons' request for recovery against the surety bond.

[14] Lammons was frustrated because she believed she needed the City to inspect the boiler to collect on the bond, but the City could not perform the inspection because EDCO had not applied for a permit. Lammons voiced her concerns with a councilwoman from her district and was urged to attend a public meeting of the Crown Point City Council. Lammons sent a written statement

---

[3] The surety bond is EDCO's "contractor's bond that's on file with the City of Crown Point as a licensed contractor." Tr. Vol. II p. 25.

[4] It is not clear if the Building Inspector was referring to both boilers and furnaces or furnaces alone.

to the Council members, and, at the public meeting, spoke for several minutes while reading a shorter version of her written statement. Lammons stated:

> The reason I am here tonight presenting this information is so that residents of Crown Point, Indiana can be protected from contractors who choose not to obtain a permit and thus circumvent an inspection of their work. Currently, there is no ordinance in place to indicate as to when a permit needs to be obtained. Whether or not a permit is needed is currently at the discretion of the Building Commission.

Ex. Vol. IV p. 38. Lammons explained that she was concerned regarding the age of the boiler; she lost the small claims case because EDCO did not provide her with the invoice for the installation of the boiler; she was unable to collect from the surety bond; the Building Inspector informed her that a permit was required for the installation of the boiler; and she had heard that another contractor had installed a boiler without a permit but the homeowner was able to obtain the permit later on. Lammons concluded in her statement, "What will the City of Crown Point do to protect its citizen[s] from unscrupulous licensed contractors?" *Id.* at 40.

[15] Lammons' presentation was posted online on the City's website. EDCO employees learned about Lammons' statements, and on February 26, 2020, EDCO filed a suit against Lammons seeking a preliminary injunction, permanent injunction, damages for defamation per se, and attorney fees. EDCO alleged that Lammons made "false and defamatory statements about EDCO being an . . . 'unscrupulous contractor[.]'" App. Vol. II p. 29.

[16]     A two-day bench trial commenced in February 2024. EDCO argued that Lammons' statements were false and defamatory and caused damage to its business. EDCO claimed that the principal damage to its business was the loss of goodwill. EDCO was unable to identify any specific lost customers but claimed that it had not received any business from the City since Lammons' statements. The evidence showed, however, that EDCO had been involved in ongoing litigation with the City regarding a separate matter and had not received any business from the City since 2018—years before Lammons' statements.

[17]     Lammons testified that it was her honest opinion that EDCO acted unscrupulously—which she defined as "[n]ot truthful" and "[n]ot fair"—but that she never stated EDCO specifically was an unscrupulous contractor during her presentation to the City Council. Tr. Vol. III p. 50. The reason for her presentation was "to have some kind of ordinance passed" because "there was no ordinance in place to protect the citizens of Crown Point for contractors who choose not to get a permit and thus their work could not be inspected." *Id*. at 48.

[18]     Neither EDCO's former executive director nor Dorris believed that a permit was required to install a high efficiency boiler in a residence. Noordermeer, however, believed that the City did require such permits based on his previous interactions with the City.

[19]     The trial court requested proposed findings of facts and conclusions thereon and took the matter under advisement. On February 21, 2024, the trial court entered an order finding Lammons liable for defamation per se and granted the permanent injunction.

[20]     The trial court entered written findings,[5] including the following:

> 63.  The Court f[inds] that [Lammons'] presentation to the City Council constituted defamation *per se*, as it purposely, intentionally, and maliciously claimed conduct as deceitful, even after our Attorney General, a Lake County Small Claims Court, and the Surety Bond holder determined that behavior to be non-deceitful.

> 64.  This Court does not accept [Lammons'] argument that the written statement, and the subsequent oral statement before the City Council were generalized complaints about the processes of the City Inspector's Office.

> 65.  The main focus of [Lammons'] claims was very clearly upon [EDCO], and [Lammons'] interactions with [EDCO].

> 66.  It was clear that both of [Lammons'] statements to the City Council – the written and then the oral – were direct attacks upon [EDCO], were defamation *per se*, and were intended to be heard

---

[5] The trial court indicated that it was required to "make specific findings under Trial Rule 52" because EDCO requested a permanent injunction. Appellant's App. Vol. II p. 14. The trial court noted that EDCO "requested an injunction in its complaint, did not seek a preliminary injunction during the pendency of this case, but again requested a permanent injunction at trial." *Id.* Trial Rule 52 does require "special findings of fact" when "granting or refusing **preliminary** injunctions." T.R. 52(A)(1) (emphasis added). Trial Rule 52, however, "say[s] nothing about permanent injunctions." *Zollinger v. Wagner-Meinert Eng'g, LLC*, 146 N.E.3d 1060, 1073 (Ind. Ct. App. 2020) (citing *Neel v. Ind. Univ. Bd. of Trs.*, 435 N.E.2d 607, 613 (Ind. Ct. App. 1982)), *trans. denied*.

by the Crown Point City Council and all persons listening to and/or observing the Council meeting.

67. While many statements made by [Lammons] were factually true, the use of the word "unscrupulous" crossed-over from public comment to actionable defamation *per se*, by intimating that [EDCO] was untruthful, not trustworthy, not honest, not fair, and was lacking in honorable principles.

Appellant's App. Vol. II p. 20.

[21] On March 21, 2024, Lammons filed a motion to reconsider and correct error. Following a hearing, on April 18, 2024, the trial court entered an order clarifying that it had not yet calculated damages and denying the motion as to the findings in the previous order. At the damages hearing on July 30, 2024, the trial court entered an order finding Lammons liable for $7,000.00 in damages and assessed $31,485.50 in attorney fees and $191.01 in court costs. Lammons now appeals.

## Discussion and Decision

### I. Standards of Review

[22] Where, as here, the trial court enters findings of fact and conclusions thereon *sua sponte*, "we apply a two-tiered standard of review, determining: (1) whether the evidence supports the findings of fact and (2) whether the findings support the judgment." *In re Adoption of E.M.L.*, 103 N.E.3d 1110, 1115 (Ind. Ct. App. 2018) (citation omitted), *trans. denied*. We will set aside the trial court's findings or judgment only if they are clearly erroneous. *Id*. "A finding of fact is

clearly erroneous if the record lacks evidence or reasonable inferences from the evidence to support it." *Id.* When findings are entered *sua sponte*, they control only as to the issues upon which the court has found, but they do not otherwise affect our general judgment standard of review, and we may look both to other findings and beyond the findings to the evidence of record to determine if the result is against the facts and circumstances before the court. *C.B. v. B.W.*, 985 N.E.2d 340, 344 (Ind. Ct. App. 2013), *trans. denied.* Whether a communication is defamatory is a "question of law[.]" *McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 347 (Ind. Ct. App. 2016), *trans. denied.* We review questions of law de novo. *Maraman v. City of Carmel*, 47 N.E.3d 1218, 1220 (Ind. Ct. App. 2015), *trans. denied.*

[23] We also note that EDCO did not file an appellee's brief in this matter. Under these circumstances, "the appellate court need not develop an argument for the appellee[] but instead will 'reverse the trial court's judgment if the appellant's brief presents a case of prima facie error.'" *Salyer v. Washington Regular Baptist Church Cemetery*, 141 N.E.3d 384, 386 (Ind. 2020) (quoting *Front Row Motors, LLC v. Jones*, 5 N.E.3d 753, 758 (Ind. 2014). "Prima facie error in this context means 'at first sight, on first appearance, or on the face of it.'" *Id.* This less stringent standard of review relieves us of the burden of controverting arguments advanced in favor of reversal where that burden properly rests with the appellee. *Jenkins v. Jenkins*, 17 N.E.3d 350, 352 (Ind. Ct. App. 2014). We remain obligated, however, to correctly apply the law to the facts in the record in order to determine whether reversal is required. *Id.*

## II. Lammons' statements do not constitute false and defamatory statements as a matter of law.

[24] Defamation consists of a communication that "'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 451 (Ind. 1999) (quoting *Doe v. Methodist Hosp.*, 690 N.E.2d 681, 686 (Ind. 1997)). The law of defamation reflects our "strong interest in protecting attacks upon individual reputation." *Id.*

[25] But the ability to collect a judgment based on the defamatory speech of another is an exception not the rule; the First Amendment ordinarily protects mere speech. The First Amendment "'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people'" and reflects our "'national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 450 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964)). Although false and defamatory speech "is one of the traditional categories of speech that is said to be without First Amendment protection," *Love v. Rehfus*, 946 N.E.2d 1, 14 (Ind. 2011), where defamation is asserted, we must be mindful that the principles of free speech are not eclipsed. Here, the trial court cast defamation's shadow beyond its intended parameters.

[26] "To establish a claim of defamation, a "plaintiff must prove the existence of a communication with defamatory imputation, malice, publication, and damages.'" *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010)

(quoting *Trail v. Boys & Girls Clubs of N.W. Ind.,* 845 N.E.2d 130, 136 (Ind. 2006)). "Any statement actionable for defamation must not only be defamatory in nature, but false." *Trail*, 845 N.E.2d at 136 (quoting *Doe,* 690 N.E.2d at 687). That is to say, the statement must state or imply facts that can be "proved true or false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990).

[27] EDCO argued, and the trial court determined, that Lammons' statements to the City Council constituted defamation *per se*. Defamation *per se* is a specific kind of defamation that "'imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct.'" *Baker v. Tremco Inc.*, 917 N.E.2d 650, 657 (Ind. 2009) (quoting *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007)). A plaintiff who succeeds on a claim of defamation *per se* is "'entitled to presumed damages 'as a natural and probable consequence' of the *per se* defamation.'"[6] *Id*. (quoting *Kelley*, 865 N.E.2d at 597).

[28] In reviewing a defamation claim, "[i]t is a question of law for the court to decide whether a statement considered in its entirety is capable of possessing a defamatory meaning or implication." *Journal-Gazette*, 712 N.E.2d at 457 (citing *Woods v. Evansville Press Co., Inc.*, 791 F.2d 480, 486 (7th Cir. 1986)). "If a statement is susceptible to both defamatory and non-defamatory meanings, the

---

[6] If not defamation *per se*, the defamatory communication may still constitute defamation *per quod*, for which the plaintiff "must demonstrate special damages." *Baker*, 917 N.E.2d at 657 (citing *Kelley*, 865 N.E.2d at 597).

matter of interpretation should be left to the [trier of fact]." *Id.* (citing *Woods*, 791 F.2d at 486).

[29] We conclude that the trial court clearly erred by determining that Lammons' statements, including the use of "unscrupulous," constituted defamation, let alone defamation *per se*. Unscrupulous means "[u]nprincipled; having or displaying no scruples." *Unscrupulous*, Shorter Oxford English Dictionary (6th ed. 2007) ("Shorter"); *see also Scruple*, Shorter ("A thought or circumstance that causes the mind unease or disquiet; a feeling of doubt or hesitation with regard to the morality or propriety of a course of action").

[30] Lammons never characterized EDCO itself as unscrupulous; rather, Lammons asked the Council, in general, "What will the City of Crown Point do to protect its citizens from unscrupulous licensed contractors?" Ex. Vol. IV p. 40. Even still, Lammons' use of "unscrupulous," at most, reflects her opinion regarding EDCO's conduct during their business relationship. This opinion does not constitute the sort of "provably false" statement necessary to trigger defamation liability. *Milkovich*, 497 U.S. at 20.

[31] Indeed, as Lammons points out, numerous jurisdictions have held that similar statements of opinion do not constitute defamation. *See, e.g.*, *Small Business Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 315 (S.D.N.Y. 2017) ("Calling someone an unethical, unscrupulous unprofessional, like any generic accusation that someone has acted unprofessionally or unethically, is a

constitutionally protected statement of opinion.") (quotation omitted, cleaned up); *Reed v. Gallagher*, 204 Cal. Rptr. 3d 178, 190 (Cal. Ct. App. 2016) (statement that plaintiff was an "unscrupulous" lawyer was "a subjective judgment, rather than a provably false statement of fact"); *Wilkow v. Forbes, Inc.*, 241 F.3d 552, 556 (7th Cir. 2001) (rejecting argument that plaintiff was defamed by statement implying he was "unscrupulous," among other statements, because an "opinion about business ethics isn't defamatory").

[32] To be sure, the mere fact that Lammons' statements express her opinion does not alone remove the statements from defamation liability. As the United States Supreme Court clarified in *Milkovich*, 497 U.S. at 18, the First Amendment does not support "a wholesale defamation exemption for anything that might be labeled 'opinion.'" Indeed, "[e]xpressions of 'opinion' may often imply an assertion of objective fact." *Id.* For example, when comparing the statements "'In my opinion Jones is a liar'" with "'Jones is a liar,'" simply "couching" the former in terms of opinion does not "dispel the[] implication[]" that Jones has lied. *Id.* at 19. Thus, whether a statement is expressed as an opinion "is not dispositive. Rather, the dispositive question is whether a reasonable fact finder could conclude that the statement implies facts which may be proven true or false." *McQueen v. Fayette Cnty. Sch. Corp.*, 711 N.E.2d 62, 66 (Ind. Ct. App. 1999) (citing *Milkovich*, 497 U.S. at 21), *trans. denied*.

[33] Here, Lammons' use of "unscrupulous" is not the sort of provably false statement couched in terms of opinion discussed in *Milkovich*. On the contrary, the statement, at most, reflects her personal ethical assessment of EDCO with

regard to its business dealings with her. And she testified at trial that this opinion was honestly held. Lammons' statements are not actionable as defamation.

[34] The trial court seems to have believed that Lammons' use of "unscrupulous" was defamatory per se because her consumer complaint with the Attorney General, small claims action, and claim against the surety bond were unsuccessful. But whether EDCO was an "unscrupulous" business was not adjudicated in these forums, and the outcomes of these actions are irrelevant to Lammons' right to voice her opinion regarding her dealings with EDCO.

[35] Ultimately, reasonable minds could differ regarding whether EDCO acted unscrupulously here. But that is precisely why Lammons' speech is protected. A consumer's right to voice his or her opinion regarding business services rendered is central, not only to the figurative marketplace of ideas the First Amendment seeks to protect, but to our free market economy as well. *See Wilkow*, 241 F.3d at 557 ("Capitalism certainly does not depend on sharp practices, but neither is an allegation of sharp dealing anything more than an uncharitable opinion."). Lammons voiced her opinion to the elected officials tasked with protecting the public from unfair business practices, and she did so with a legitimate purpose to persuade the City Council to adopt an ordinance clarifying the permit requirements for the installation of boilers. Lammons' statements do not constitute defamation as a matter of law. The trial court's findings are clearly erroneous, and we, therefore, reverse the judgment of the trial court.

## Conclusion

[36] Lammons' statements did not constitute defamation. Accordingly, we reverse the judgment of the trial court.

[37] Reversed.

Altice, C.J., and Brown, J., concur.

ATTORNEYS FOR APPELLANT

Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Adam M. Sworden
Valparaiso, Indiana